UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

JARED BEATTY,

    Plaintiff,

v.

OLIN CORPORATION,

    Defendant.

Case No. 09-cv-795-JPG-SCW

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Olin Corporations's (hereinafter "Olin") Motion for Summary Judgment (Doc. 16) and Memorandum (Doc. 17) in support thereof. Plaintiff Jared Beatty (hereinafter "Beatty") filed a Response (Doc. 20) thereto, to which Olin filed a Reply (Doc. 22).

For the following reasons, the Court **GRANTS** the instant motion.

## BACKGROUND

### I. Facts

In analyzing a motion for summary judgment, the reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court, construing the evidence and all reasonable inferences in the light most favorable to Beatty, finds as follows:

Around July 6, 2004, Beatty began working for Olin as a caster. Approximately fourteen months later, Beatty injured himself at work. After a roughly two month absence and

several months of light duty work for which he received workers' compensation benefits, Beatty would fully resume his duties at Olin.

On or about September 28, 2007, Beatty injured both his side and lower back while working as an adjustor at Olin. At the company's medical department's behest, Beatty met with his personal physician. The doctor issued an off-work note that lasted through October 5, and Beatty provided this note to Olin. Then, on October 15, Olin's medical department sent Beatty a letter telling him to report for an independent medical evaluation because the company had not received documentation allowing him to be off. Beatty never showed. Around one week later, David Kern (hereinafter "Kern"), Assistant Director of Labor Relations, sent Beatty a letter advising him to call the medical department and to report to work or face discipline. This time, Beatty responded by calling someone at Olin who may or may not have been Kern. It was also around this time that Olin ordered brief surveillance of Beatty.

Beatty saw his personal physician again on October 25, at which time the doctor provided Beatty with a note that placed him off-work from September 27 through October 28. The note also released Beatty for light duty on October 29. Beatty commenced light duty work on October 31, only to injure his shoulder a day later. Per Olin's instruction, Beatty met with his doctor yet again. The doctor provided him with another off-work note that lasted through November 19, which Beatty transmitted to Olin on November 5. Around this time, at Olin's request, Beatty was also examined by an independent medical doctor. Olin did not receive the report of this examiner until November 19.

It bears mentioning that, throughout much of the foregoing, Beatty called into work to remind Olin of his several off-work notes. But, on an unspecified date, an unidentified woman

in Olin's medical department informed Beatty that he no longer needed to call in due to his doctor's notes; after this, Beatty no longer reported his absences to Olin. Doc. 20-22, p. 14 ("I think most of the time I was off[,] they had me not call in because they had the documentation and they knew what my doctor said.").

Meanwhile, on November 14, a metallic manufacturing clerk in Beatty's department e-mailed Bill Moore (hereinafter "Moore"), Manager of Labor Relations and Ethics Compliance at Olin and subordinate to Kern, regarding Beatty. The clerk and Moore corresponded via e-mail for roughly twelve minutes about "how [Beatty] should have been discharged a while back [for violation of general plant rules]" and how "[h]e ha[d] not been calling off for a couple of weeks." Doc. 17-1, p. 16. This was the first time Moore had heard anything about Beatty, his unreported absenteeism, or that he had suffered work-related injuries.

Moore then considered the collective bargaining agreement that governs Olin and its employees, which maintains that one who fails to call off work for three consecutive days will be subject to an administrative quit.[1] Without consulting Kern — who knew through his

---

[1] The parties did not file the relevant portion of the collective bargaining agreement. They did, however, submit Olin's attendance control program, which states, in pertinent part, as follows:

> [W]hen you are absent, you must report your absence each day, unless you are on an approved leave of absence. An approved leave of absence means that 1) you have submitted the proper documentation to the Company <u>and</u> 2) you have received written notification that your leave has been approved. Failure to do so will result in disciplinary action up to and including discharge.
>
> If you fail to report your absence for 3 consecutive working days, you will be subject to an administrative termination under terms of the Collective Bargaining Agreement.

Doc. 20-1, p. 1 (emphasis in original). According to Moore's deposition testimony, the three-day no report rule can also be found at General Plant Rule 1-3 and Article 6, Section 6.3 of the collective bargaining agreement. Doc. 17-1, p. 9.
Olin's medical department decided whether Beatty's medical and workers' compensation leave requests were approved.

secretary that Beatty had a doctor's slip from November 5 to November 19— or Olin's medical department, Moore promptly decided to terminate Beatty's employment because he could not have been on approved leave without calling in. On November 16, Olin sent Beatty a letter that cited failure to report off work three consecutive working day absences — from November 7 through November 13 — as the basis of his termination.[2] Beatty does not remember whether he called in those days, but his deposition testimony suggests that he did not due to what the unidentified woman said. Doc. 17-2, p. 24 ("I think [Olin] told me not to call in[.]"). One of those days, November 9, was the date that the independent medical examiner evaluated Beatty.

In December 2007, Beatty filed a workers' compensation claim with the State of Illinois that was settled the following February. The parties' settlement contract lump sum petition and order, which Beatty and his counsel personally signed and declared to have read, stated that Beatty was "[s]ubsequently terminated for unrelated reasons." Doc. 17-2, p. 44.

## II. Relevant Procedural Posture

On October 1, 2009, Beatty filed a lawsuit against Olin with this Court, alleging one count of unlawful retaliation for asserting his workers' compensation rights. Olin now moves for summary judgment on this claim.

## ANALYSIS

### I. Motions for Summary Judgment Generally

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-*

---

[2] Kern admitted that an employee would not normally work more than five consecutive days at Olin

*Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must typically present specific facts supported by the record to show that a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## II.  Retaliatory Discharge in Relation to Workers' Compensation Rights

Illinois has long recognized a cause of action for retaliatory discharge in violation of one's assertion of workers' compensation rights. *See Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357 (Ill. 1978); 820 Ill. Comp. Stat. Ann. 305/4 (West 2011). The elements of such a cause of action are as follows: "(1) that [plaintiff] was an employee before the injury; (2) that he exercised a right granted by the Workers' Compensation Act; and (3) that he was discharged and that the discharge was causally related to his filing a claim under the Workers' Compensation Act." *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 406 (Ill. 1998). The burden of proof always rests with the plaintiff as to all three elements. *Id*.

### A.  "Causal Connection" Element

Olin does not seriously dispute that Beatty meets the first two elements of a retaliatory discharge claim; rather, Olin argues that Beatty cannot make a showing as to the third, "causal connection" element. With respect to said element, it is "essential" that a plaintiff show the

5

decision-makers responsible for his termination knew that he filed or intended to file a workers' compensation claim. *Marin v. Am. Meat Packing Co.*, 562 N.E.2d 282, 286 (Ill. App. Ct. 1990) (deeming nurse's statement irrelevant because she was not involved in the decision to terminate plaintiff); *Cannella v. Nationwide Carriers, Inc.*, 687 F. Supp. 362, 365 (N.D. Ill. 1988) ("[W]e find that in the absence of evidence that the decision-makers were aware that Plaintiff intended to file a claim, the timing of the discharge in itself is insufficient to create a genuine issue of fact as to causation."); *Mercil v. Fed. Express Corp.*, 664 F. Supp. 315, 319 (N.D. Ill. 1987) (emphasizing that those who ended plaintiff's employment were oblivious to his exercise of workers' compensation rights). This knowledge may be reasonably inferred, especially if termination occurs "on the heels of the protected activity." *See Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 774 (7th Cir. 2008) (citation and quotation marks omitted).

Even where a plaintiff demonstrates that the decision-maker knew about his workers' compensation claim, Illinois courts have found a lack of causality where the basis for discharge is valid and nonpretextual. *Hess v. Carcor, Inc.*, 603 N.E.2d 1262, 1273 (Ill. App. Ct. 1992); *Slover v. Brown*, 488 N.E.2d 1103, 1105 (Ill. App. Ct. 1986). For example, excessive absenteeism generally is as an appropriate grounds for termination, even if a compensable injury caused such absenteeism. *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992). In fact, an employer may present a defense that is allegedly unlawful or illegal in nature so long as it was nonpretextual. *See Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407 (Ill. 1998).

### B. Olin Did Not Retaliate Against Beatty for His Anticipated Exercise of Workers' Compensation Rights

Here, summary judgment must be granted to Olin because Beatty cannot demonstrate that his termination was causally related to his exercise of workers' compensation rights. The simple fact is that *only* Moore made the decision to discharge Beatty, and Moore reached this decision without knowing anything about Beatty's injury or that he would eventually file a workers' compensation claim. Moore's testimony is not contradicted by the record and cannot be. While Beatty emphasizes that Kern and Olin's medical department knew about the personal physician's notes, Moore did not speak to either, thereby rendering their knowledge irrelevant to the instant analysis. Put simply, in failing to demonstrate that the decision-maker was remotely aware of an impending workers' compensation claim, Beatty is missing an "essential" ingredient of his retaliatory discharge claim per *Marin* and other analogous precedent.

Beatty makes much ado about the fact that Moore's decision was premised upon misinformation that he received from others who allegedly had a retaliatory motive. Beatty argues that application of the "cat's paw" legal theory or the "garbage in/garbage out" adage dictates that a retaliatory motive be imputed to Olin. The cat's paw theory "imputes a subordinate's impermissible motives to a decision-making superior if the subordinate wields a "singular influence" over the superior." *Thakkar v. Station Operators, Inc.*, 697 F. Supp. 2d 908, 931 n.23 (N.D. Ill. 2010) (citing *Staub v. Proctor Hosp.*, 560 F.3d 647 (7th Cir. 2009)). Beatty, however, has not provided the Court with any cases that discuss the cat's paw theory in the context of retaliatory discharge for exercising one's workers' compensation rights, and the Court is unaware of any such cases. This is likely because the cat's paw theory is largely

confined to cases involving Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Nevertheless, even if the cat's paw theory, garbage in/garbage out adage, or some other doctrine of imputation applied to Moore, it would invariably fail. The only individual that contacted Moore about Beatty prior to his discharge was the metallic manufacturing clerk, and Beatty has not put forth any evidence that the clerk harbored retaliatory animus.³ Put simply, the Court cannot and will not reasonably infer Beatty's notion of a vast conspiracy where there is no serious evidence to support it.

Moreover, the Court has thoroughly reviewed the record and finds that the basis of Beatty's discharge was valid and nonpretextual. Moore terminated Beatty's employment because he did not call in his absences for more than three days — a clear violation of the parties' collective bargaining agreement and Olin's attendance control program. Meanwhile, Kern and individuals within Olin's medical department wanted to discharge Beatty because he persistently missed work without approved leaves of absence and failed to call in such absences. This too violated the collective bargaining agreement and the company's attendance policy.⁴ In response, Beatty points to the unidentified woman in Olin's medical department

---

³ Beatty does point out that the clerk's e-mail to Moore was also sent to Kelly Brooks, who worked in Olin's loss prevention and workers' compensation departments, and invites the Court to believe that a reasonable jury could conclude that the e-mail was motivated by fear of workers' compensation liability. In light of the fact that the clerk e-mailed eight other individuals at Olin, including Moore, as well as the fact that her e-mail indicates ignorance as to Beatty's situation, Doc. 17-1 ("Can someone please tell us what is going on with Mr. Beatty?"), the Court rejects Beatty's invitation.

⁴ In early November, since Beatty was not on approved workers' compensation leave and since Olin's medical department had not required Beatty to leave work during the entirety of his absence, *see* Doc. 20-1, p. 2, Beatty had to report his absences each day unless he provided Olin with proper documentation *and* received written notification of approved leave. *See supra* note 1. While Beatty provided his doctor's notes to Olin, he never supplemented the notes with documentation despite repeated requests and never received written notification of leave approval from the company. Thus, Beatty's failure to report violated the express terms of Olin's attendance rules.

who told him that he no longer needed to call in absences.[5] At best, the woman's assurances excused Beatty from his obligation to call Olin and demonstrate that Moore rushed to judgment by not calling the medical department; still, this occurrence adds nothing to the crux of the claim that Olin discharged Beatty for exercising his workers' compensation rights. Similarly, the Court is unconvinced by Beatty's emphasis on the surveillance conducted by Olin's loss prevention department and the date of his independent medical examination. Surveillance of an injured employee is not uncommon, and the date of the independent medical exam again shows, at most, Moore's rush to judgment. Put simply, Olin appears to not have been motivated by workers' compensation concerns as it was Beatty's failure to comply with the terms of the collective bargaining agreement and attendance control policy. Of course, this is permissible pursuant to *Hartlein* and Illinois' general adherence to the doctrine of at-will employment.

There are a number of other factors that demonstrate Olin lacked a retaliatory motive in terminating Beatty's employment. Several years before the injury at issue, Beatty had been injured at Olin. During that time, Beatty took two months off, performed several months of light duty work, and received workers' compensation benefits — all without facing retaliation. After he injured himself this time, Olin made several efforts to get Beatty to return to work, even if it had to be light duty. Indeed, an employer's efforts to restore a plaintiff to employment may demonstrate lack of retaliatory motive. *See Marin v. Am. Meat Packing Co.*, 562 N.E.2d 282, 286 (Ill. App. Ct. 1990). Finally, while the Court places little stock in this factor, it cannot be ignored that Beatty's workers' compensation settlement contract stated that

---

[5] Olin argues that the woman's statements are hearsay and should not be considered by the Court. The Court disagrees. Her statements are not offered for the truth of the matter asserted, and they represent statements made by an agent of Olin within and during the scope of her employment. Fed. R. Evid. 801(c), (d).

he was discharged for "unrelated reasons." Doc. 17-2, p. 44. This curious declaration, which Beatty and his attorney signed approximately one month after his discharge, begs the question of why the Court should now find a retaliatory motive when Beatty did not so soon after his termination.

In his response brief, Beatty relies heavily on *Hollowell v. Wilder Corp. of Delaware*, 743 N.E.2d 707 (Ill. App. Ct. 2001) and *Grabs v. Safeway, Inc.*, 917 N.E.2d 122 (Ill. App. Ct. 2009). Both cases are inapposite. *Hollowell* articulated the proposition that an employee should not be made to choose between the instructions of his treating physician and the opinion of an independent medical examiner. *Hollowell*, 743 N.E.2d at 711. The *Grabs* Court echoed this sentiment, holding that an employer cannot *solely* rely on an independent medical examiner when terminating one's employment for failing to return to work or failing to call in absences. *Grabs*, 917 N.E.2d at 124. When terminating Beatty, Olin heeded both *Hollowell* and *Grabs* in that it did not rely upon the opinion of the independent medical examiner or force Beatty to choose between the opinion of his personal physician and that of Olin's examiner. In fact, Olin did not even receive the report of the independent medical examiner until several days after Beatty had been discharged. As such, Beatty's reliance upon *Hollowell* and *Grabs* is misplaced.

## CONCLUSION

There is no genuine issue of material fact as to whether Olin terminated Beatty's employment in retaliation for exercising his workers' compensation rights. For this reason and the reasons discussed throughout this memorandum and order, the Court **GRANTS** Olin's Motion for Summary Judgment (Doc. 16). Further, the Court **DENIES as moot** Olin's

Motion to Continue (Doc. 32). The Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: July 13, 2011**

                                                    s/ J. Phil Gilbert
                                                  **J. PHIL GILBERT**
                                                  **DISTRICT JUDGE**